Bob Stone Cordage Co., et al. v. United States    (No. 5113)*

---

*C.A.D. 838.

United States Court of Customs and Patent Appeals, March 12, 1964

*James J. Morrison*, for appellants.

*John W. Douglas*, Assistant Attorney General, *Andrew P. Vance*, Chief, Customs Service (*Richard J. Kaplan*, trial attorney, of counsel) for the United States.

*William Whynmann*, amicus curiae, on behalf of appellee.

*Edward N. Glad*, amicus curiae.

[Oral argument February 3, 1964, by Mr. Morrison and Mr. Kaplan; Submitted on brief by Edward N. Glad, as amicus curiae.]

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Jr., Associate Judges

ALMOND, Judge, delivered the opinion of the court:

Bob Stone Cordage Co. et al. ▮ appeal from the judgment of the United States Customs Court, Second Division [1] overruling four consolidated protests against the classification of imported merchandise by the Collector of Customs for the port of New Orleans, Louisiana.

The merchandise was invoiced as binder twine. There is no dispute that the imported merchandise consists of single-ply twine manufactured from henequen and measuring not exceeding seven hundred and fifty feet to the pound. The merchandise was assessed with duty at 15 percentum ad valorem under the provisions of paragraph 1005(b) of the Tariff Act of 1930, as modified, for cords and twines.

Appellants claim that the merchandise is entitled to free entry as "binding twine" under the provisions of paragraph 1622 of the Tariff Act of 1930, as amended.

Paragraph 1005(b), as modified (T.D. 51802), provides:

> Cords and twines (whether or not composed of three or more strands, each strand composed of two or more yarns), tarred or untarred, single or plied, wholly or in chief value of manila (abaca), sisal, henequen, or other hard fiber_____15% ad val.

Paragraph 1622, as amended (T.D. 52861), provides:

> All binding twine, and twine chiefly used for baling hay, straw, and other fodder and bedding materials, manufactured from New Zealand hemp,

---

[1] C.D. 2331.

henequen, manila, istle, or Tampico fiber, sisal grass, or sunn, or a mixture of any two or more of them, of single ply and measuring not exceeding seven hundred fifty feet to the pound.

The contentions of the opposing parties here, succinctly stated in appellee's brief and as argued before us, are:

*Appellants' Contentions*

1. That the imported merchandise was classified by the Collector of Customs as "Binder Twine" and improperly liquidated under paragraph 1005(b) of the Tariff Act of 1930, as modified.
2. The imported merchandise is "binding twine" within the purview of paragraph 1622 of the Tariff Act of 1930, as amended.

*Appellee's Contentions*

1. That the Collector of Customs for the port of New Orleans, Louisiana, acting pursuant to sec. 505 of the Tariff Act of 1930, ascertained, fixed, and liquidated the rate and amount of duties to be paid on the imported twine at 15 per centum ad valorem pursuant to the provisions of paragraph 1005(b) of the said Act, as modified.
2. The record supports the holding by the United States Customs Court that the plaintiffs (appellants) failed to prove that the imported merchandise is "binding twine" within the purview of paragraph 1622 of the Tariff Act of 1930, as amended, as was their burden if they were to prevail.

These contentions as stated above are, in material substance, embraced by and responsive to appellants' assignment of errors.

The Customs Court, in a unanimous opinion, overruled the protests. After a thorough review of the evidence submitted by appellants, the court concluded:

Clearly, the evidence in this case fails to establish that twine in balls measuring less than 500 feet to the pound was a type of twine chiefly used in agricultural pursuits for binding purposes. Since this was the proposition which plaintiffs were required to sustain to bring their importations within the scope of the provisions for binding twine in paragraph 1622, their claims for free entry must be denied.

To sustain their claims for free entry, appellants (plaintiffs below) submitted the testimony of seven witnesses and introduced a number of exhibits.

The witness Joseph F. Castro was identified as a cordage technician in the employ of a Mexican twine manufacturer. He stated that, in a supervisory capacity, he was in charge of the machinery and equipment for the manufacture of both baler and binder twine and that binder twine was drawn out "to make it 500 feet per pound." The witness identified exhibit 2 as illustrative of that which he knew as binder twine in Mexico and exhibit 3 as representative of baler twine. It should be here noted that counsel for appellants conceded that he did not have and could not produce any sample of the im-

ported merchandise. During the examination of Castro, the following colloquy is noted:

Judge Ford: In other words, is it possible, based upon your experience in the manufacture of this binder twine, that the length is variable; there is a variance in the length?

The Witness: Yes, sir.

Judge Ford: From how much to how much?

The Witness: Sometimes it runs 400—you mean the tolerance that we consider at the mill?

Judge Ford: I am considering the length.

The Witness: About 5%.

Judge Ford: What would that actually mean in footage?

The Witness: 475 to 525. It would be 500 feet per pound.

The merchandise in issue, according to the chemist's reports, measured from 352 to 473 feet per pound. As to the per pound measurement, determined by the government chemist, there is no dispute.

The witness Mansfield testified that he was presently engaged in farming; that in 1954 and 1955 his business was that of selling and servicing farm equipment and the territory he served covered parts of the States of Nebraska, Oklahoma, Kansas, Arkansas, Missouri and Iowa. The witness identified exhibit 2 as binder twine similar to that used in a roto baler; that the only type of such baler known to him was made by the Allis Chalmers Manufacturing Company and used exclusively for baling hay. He identified exhibit 3 as what was known to him as baling twine used in an "entirely different type of machine than the roto baler."

The witness stated that if exhibit 2 was established to be 350 feet per pound, his opinion relative thereto would change "to some extent" because:

* * * If I noticed in the process of baling that I wasn't getting the number of bales out of a ball or a bale of twine, then it would become evident to me that the twine was a little heavier a grade because, assuming I know the weight to be there, it just wouldn't bale as much hay per ball.

Judge Lawrence: Would it follow your statement that it could not be economical to use twine if it be over 352 feet to the pound?

The Witness: Well, sir, I would say if it all averaged 350 feet per pound, then the manufacturer would have to correct it because he advertises it. All I ever saw it advertised, it averaged 500 feet per pound, and I believe averaged 90-pound tensile strength.

The witness further stated that if exhibit 2 averaged 352 feet per pound, the machine could be adjusted to make it usable as a baling twine but based on his experience, "I would say that it was somewhere around 500 feet" and that a variance of as much as 100 feet per pound would be noticeable "because it would be 20% less twine" with an increase in thickness which would cause "far more trouble" in the operation of the machinery.

The witness True is identified as the Director of Weights and Measures for the Board of Agriculture in the State of Kansas whose duty it is to test the per pound footage of agricultural twine sold in that state. He testified that it constitutes a violation of the law of his state to dispense twine which measures more than 4% under that labeled as 500 feet per pound; that such twines are chiefly used in the Allis Chalmers roto baler; that Kansas is one of the leading states in the use of binder twine; that his experience with twine was limited to the State of Kansas; that he had no knowledge whether other states conducted similar tests and that binder twine which ran as low as 352 feet per pound would be usable but "It might not be practical from the purchaser's standpoint."

The witness Stone is identified as one of the partners of appellant, Bob Stone Cordage Company of Charlton, Iowa. We have thoroughly examined the testimony of this witness and measured it in the light of the analysis made by the Customs Court. That analysis is a fair summary supported by the record. It is as follows:

* * * that the merchandise which his company ordered from the Mexican manufacturer was binder twine and baler twine, but he had no personal knowledge of what twine was supplied in fulfillment of his order. All twine which he imported was sold through distributors and wholesalers all over the United States. It is, however, used mostly in the Middle West, as far south as Texas and New Mexico, as far north as Wisconsin, Minnesota, Montana, and the Dakotas, and as far east as Indiana and Ohio.

Stone's personal experience in the use of binder twine dated back to 1910. It involved a very thorough knowledge of both automatic hay balers and grain binders, but was limited in geographical area to Iowa and northern Missouri, Elsewhere, he had no occasion to see how any particular shipment was used by the customers of his dealers, who were primarily machinery and seed distributors. He testified that all of the Ozark brand twine which he imported was sold to and distributed by the witness Mansfield; that all of the Blue Circle, and Champion twine, as represented by plaintiffs' exhibits 19 and 20, respectively, was sold as binder twine; and, in the area where he had seen it used, about 95 per centum went into automatic hay balers, the remainder in corn and grain binders, of which there were not too many left in the Middle West any more.

Stone further testified that a Roto baler which ordinarily uses binder twine, could produce a bale of hay with baler twine; that baler twine could be used in corn and grain binders; that a farmer would not know or be affected by the fact that a ball of twine ran as low as 350 feet per pound; that if his firm received such underfootage twine, he would complain to the manufacturer, since binder twine is "supposed to have an average of 500"; that, to his knowledge, he has never ordered, received, or sold twine of less than 500 feet; and that he never received any complaints from any source with respect to binder twine.

The witness McElvain identified certain illustrative exhibits. These exhibits illustrated a bale of hay using baler twine; a bale of hay using a heavy one-ply sisal twine; a bundle of corn tied by a corn binder using a heavy one-ply sisal twine and a bundle of corn tied by a binder

with baler twine. The witness stated that he saw the machines operate; that no difficulty was experienced and that the tests were made experimentally for the purposes of this case.

The witness Godnick, vice president of New York Twine Corp., one of the ultimate consignees of the twine in issue, testified that he ordered this twine as 500 foot binder twine; that it was shipped as such but that he did not know whether it was 500 feet to the pound. The witness stated that he would not accept for good delivery binder twine with a footage less than 500 feet subject to the 5% tolerance; that he would "order it at 500 because it is the standard in the trade." He further stated, in answer to a question propounded by the court, that he did not know, from his experience in the business, of any place in the United States where twine of the size 300 feet, 350 feet, 360 feet, 380 feet, 400 feet or 450 feet was used for agricultural purposes and that he did not sell such twine for agricultural purposes. In this connection the witness qualified his answer by stating: "If this were being sold at that footage of 400 or 450 per pound, I doubt that I, as a twine man, or the person using that twine, would actually have known the difference * * *."

W. N. McAskill was called as a witness for appellants. He testified that he was the appraiser of merchandise at New Orleans; that pursuant to his official duties he advisorily classified the merchandise covered by the protests in issue. When asked why he had appraised the merchandise differently than as entered, he responded that: "It was changed because the examiner found, * * * that the particular twine did not come up to the specifications recognized in the trade as binder twine." McAskill stated further:

* * * It was underweight, irregularly woven, and according to trade information that we have been able to obtain, I have been in the Customs now for 31 years passing on this merchandise, and based on my experience and the experience of the examiners and all of the technical information that we had been able to obtain, that twine is not the twine that is commercially known or sold in the usual course of business as binder twine.

It is a basic and well settled principle in customs litigation that the protesting importer must carry the twofold burden of proving (1) that the collector's classification is erroneous and (2) that the classification for which he contends is correct. In *Atlantic Aluminum & Metal Distributors, Inc.* v. *United States*, 47 CCPA 88, 91, C.A.D. 735, this court said:

It is axiomatic that a presumption of correctness attaches to the collector's classification. *Lowenthal Trimming Corp.* v. *United States*, 39 CCPA 149, C.A.D. 477; *McKesson & Robbins, Inc.* v. *United States*, 27 CCPA 157, C.A.D. 77. To overcome this presumption, the protestant has the burden of proving not only that the collector erred, but also that the classification urged by the protestant

is correct. *W. T. Grant Company* v. *United States*, 38 CCPA 57, C.A.D. 440; *United States* v. *Good Neighbor Imports, Inc.*, 33 CCPA 91, C.A.D. 321; *United States* v. *Fred. Gretsch Mfg. Co., Inc.*, 28 CCPA 26, C.A.D. 120.

Appellants contend that inasmuch as the collector described the merchandise in issue as "Binder Twine" on Customs form 4297, this memoranda description constituted the classification of the merchandise so as to bring it within the purview of paragraph 1622 of the Tariff Act and that the presumption of correctness attaches to such alleged classification. The record discloses that the entry papers contained merchandise other than that which was protested. The importers distinguished the merchandise by identifying it as "Binder Twine." The record affords no tenable basis for a conclusion other than the merchandise was in fact assessed and liquidated under paragraph 1005 (b) notwithstanding the fact that it was invoiced as, and referred to in identifying memoranda as "Binder Twine."

We are in accord with the disposition of this aspect of the case by the Customs Court:

The collector's function, as defined by section 505 of the Tariff Act of 1930, is to "ascertain, fix, and liquidate the rate and amount of duties to be paid on such [entered] merchandise as provided by law * * *." Under section 514 of said act, protest lies against his decision "including the legality of all orders and findings entering into the same, as to the rate and amount of duties chargeable." Basically, therefore, it is the assessment of duties, not the classification *per se*, which is the protestable act. The classification may be attacked as a finding entering into the decision as to the rate and amount of duties, but it is clearly subordinate to, and becomes merged in, the liquidation, which is the final computation of the amount of duties determined to be due the United States. *United States* v. *B. Holman, Inc.*, 29 C.C.P.A. (Customs) 3, C.A.D. 164.

In any event, there is no tariff provision for "binder twine," and the assessment of duty at the rate of 15 per centum ad valorem constitutes a determination that the twine, albeit described as binder twine, is not the "binding twine" provided for in paragraph 1622, but is, in fact, the single-ply twine described in said paragraph 1005 (b), as modified. The argument on this phase of the case is, therefore, deemed untenable.

The clarity of the language of Paragraph 1622 is clearly manifest. All binding twine of single-ply manufactured from any of the products enumerated with a per pound measurement not exceeding 750 feet is embraced within the scope of the statute. If it is a class or kind of binding twine chiefly used in agricultural pursuits for binding purposes, it qualifies for free entry. The relevancy of the variable measurements reflected by the record before us relates to whether or not the twine is of a class or kind chiefly so used. The name applied by way of commercial designation or distribution and the measurements within the designated limit in no wise abridges the embrasure of the statute provided the criteria of use are established.

The dispositive issue here, as we see it, and as stated by the court below, involves the use applied to the imported merchandise. ■ The term "use" imports "chief use." Adequacy, adaptability or susceptibility for use has very little, if any probative value. As this court said in the *United States* v. *The Baltimore & Ohio R.R. Co.*, 47 CCPA 1, C.A.D. 719:

\* \* \* it is not the use of a particular shipment but rather that of the particular class or type of goods involved which determines its chief use. \* \* \*

\*　　\*　　\*　　\*　　\*　　\*　　\*

Merely because one *can* drink from the imported cups and saucers does not establish the chief use thereof. A fugitive use or a mere susceptibility or capability of use is not controlling as to such chief use.

■ Particularly apposite to the twine under consideration here is the statement of this court in *L. Tobert Co., Inc. et al.* v. *United States*, 41 CCPA 161, C.A.D. 544:

While judicial notice may be taken of well known uses of an article, chief use is a question of actual fact which \* \* \* should be established on the basis of positive testimony representative of an adequate geographical cross section of the nation.

We have set forth in considerable detail the testimony adduced on behalf of appellants to discharge the burden incumbent upon them. This testimony, in our judgment, falls far short of establishing a prima facie case that the imported merchandise in issue was a type of twine chiefly used in agricultural pursuits for binding purposes.

No samples of the imported twine were introduced in evidence. The exhibits introduced were all illustrative. No witness could or did state that any of the imported merchandise ever went into agricultural use.

As pointed out by the court below, no witness concerned with the manufacture and distribution of the imported merchandise had any direct knowledge of its length per pound, or of the fact that any binder twine marketed in this country fell substantially below the acknowledged standard of 500 feet per pound. They acknowledged that it would not be economically practical for farmers to use twine substantially less than the standard length per pound in baling hay with roto balers. There was no proof that twine of the proven measurements of the imported merchandise had ever been used for binding purposes in farming operations.

While the record shows that the principal area in this country for the consumption of binder twine is the entire Middle West, yet the observations of the witnesses were limited to the states of Nebraska, Oklahoma, Kansas, Arkansas, Missouri and Iowa. Kansas was virtually eliminated from this group of states by the testimony of the Director of Weights and Measures of that state that binder twine

under 4% of twine labeled 500 feet per pound cannot be legally used therein.

Twine is not the type of article to which one might apply the principle of *res ipsa loquitur* as to its use for agricultural purposes. It is susceptible to and used for varied purposes embracing agriculture, industry and commerce in general. This is true whether it be manufactured and distributed as binding twine or baler twine.

We find totally devoid of merit appellants' contention that the court below has placed a duty on an agricultural binding twine in negation of Congressional intendment. The duty here is on an imported twine which appellants' proof has failed to bring within the ambit of paragraph 1622 by showing that it is chiefly used in this country for agricultural binding purposes. Whatever inferences fairly deducible from the record which might otherwise have tended to support appellants' contentions were dispelled by the testimony of the appraiser, appellants' own witness, that the imported merchandise did not come up to the specifications recognized in the trade and that "it would not be good delivery as binder twine."

The most recent case before this court involving paragraph 1622 was *United States* v. *Geo. Wm. Rueff, Inc.*, 41 CCPA 95 C.A.D. 535 (1953). The importation, sisal twine, was classified pursuant to the provisions of paragraph 1005 (b) of the Tariff Act of 1930. The importer claimed that the merchandise was entitled to free entry under paragraph 1622 as "binding twine" in that it qualified under the specifications and limitations of the paragraph. The primary contention of the government was that "binding twine" and "binder twine" are synonymous terms and "that since the record shows the * * * merchandise is not 'binder twine' then it is not 'binding twine,' " within the purview of paragraph 1622. The government also urged that the importer had failed to establish that chief use was in the binding of small grains. In affirming the decision of the court below, this court said:

* * * The definitions cited by the trial court show that the term "binding twine" is not limited solely and exclusively to the tying or binding of small grains, but are flexible enough to include twine of the instant type in harvesting operations for tying or binding purposes.

While there are, as pointed out above, some differences in the physical composition of the two twines, at the same time they also possess many similar physical characteristics as well as in the common use to which they are put. Both are used in what are clearly agricultural pursuits, viz., in the binding of small grains and in the baling of hay. * * *

* * * * * * *

The evidence of record leaves no doubt that the chief use of the involved twine was in the baling of hay. No witness testified or even suggested any other use.

Moreover, there is a stipuation by counsel for the respective parties that "* * * it is agreed that at the time of the importation herein, baler twine was chiefly used in automatic or pick-up baling machines for the baling of hay."

Contrary to appellant's contentions, there is no distinction in principle between *Rueff*, supra, and the instant case. The significant and determinative distinction resides in the matter of proof of chief use. In *Rueff* the plaintiff made out a prima facie case that the imported merchandise was chiefly used as binding twine. The record in the instant case fails in proof of a prima facie case that the involved merchandise is chiefly used as binding twine in any agricultural pursuit.

For the reasons stated, we *affirm* the judgment of the United States Customs Court.